**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| MICAH L. BUNCE, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| vs. | ) |
| | ) |
| JAMES FELDMAN, EVAN LONDO, and ANDREW | ) Case No. |
| ZEIGLER, of the Salina Police Department, | ) |
| RICHARD JAMES, former Deputy County Attorney | ) |
| of Saline County, in their individual capacities; | ) |
| CITY OF SALINA, KANSAS; and the BOARD OF | ) |
| COUNTY COMMISSIONERS OF SALINE COUNTY, | ) |
| | ) |
| *Defendants*. | ) |
| | ) |

## **COMPLAINT**

COMES NOW the plaintiff, Micah Bunce, through his undersigned counsel of record, and in support of his claims against Defendants, JAMES FELDMAN, EVAN LONDO, ANDREW ZEIGLER, of the Salina Police Department and RICHARD JAMES, former Deputy County Attorney of Saline County in their individual capacities, CITY OF SALINA, KANSAS and the BOARD OF COUNTY COMMISSIONERS OF SALINE COUNTY, hereby states and alleges as follows:

### **INTRODUCTION**

1.      This action involves the concerted efforts of the individual defendants to engineer a malicious and retaliatory criminal prosecution, unlawful seizure, and the public humiliation of plaintiff, Micah Bunce, a special investigator with the Salina Regional Public Defender Office.

2.      Based upon false testimony and a false affidavit devised by defendants – and a malevolent, underlying desire to see Mr. Bunce terminated from his place of employment – Mr.

1

Bunce was maliciously charged and prosecuted for a false claim of perjury through an abuse of process by defendants.

3.      Prior to the events outlined in this Complaint, Micah Bunce was a lifelong public servant who had dedicated his career to law enforcement and public defense work in the State of Kansas. At that time, Mr. Bunce was employed as a Special Investigator for the Kansas Board of Indigent Defense Services (BIDS or the Public Defender) and assigned to the Salina Regional Office – often requiring Mr. Bunce to challenge the work of Salina Police Department (SPD) officers.   Mr. Bunce routinely interacted with the Salina Police Department, Saline County Attorney's Office and the Saline County courts while assisting indigent defendants with constitutional defense rights.

4.      Motivating the wrongful conduct of the members of the Salina Police Department and Saline County Attorney's Office was a preliminary hearing for a woman named Ashley Dempsey on a felony count of possession of methamphetamine in case no. SA-2024-CR-711 in which Mr. Bunce offered testimony on behalf of the defense. Mr. Bunce testified that during his time as a police officer with the Salina Police Department, six years prior, between 2015-2018, SPD had NARTEC brand test kits that could test for the presence of bath salts. This brief, immaterial testimony became the pretext for the coordinated retaliatory actions of the individual defendants against Mr. Bunce.

5.      Based upon this testimony, Defendants Captain James Feldman, Sgt. Andrew Zeigler, Evidence Technician Evan Londo, and Saline County Deputy Attorney Richard James, "investigated" Mr. Bunce for alleged perjury, prepared and presented an affidavit of probable cause, and had Mr. Bunce charged with the crime of perjury. The defendants' claims stem from a

baseless theory that NARTEC brand test kits were not used by the Salina Police Department prior to 2019 and could not be used to test for bath salts, and that Mr. Bunce had falsified his testimony.

6.    In truth, as discussed *infra*, the SPD did in fact have NARTEC brand test kits prior to 2019, and furthermore, had the appropriate combination of NARTEC test kits to test for bath salts from at least 2015 forward.  Mr. Bunce's testimony was truthful and fully verifiable.

7.    That notwithstanding, through the efforts of members of the Salina Police Department and the Saline County Attorney's Office, Mr. Bunce subsequently underwent a preliminary hearing, was bound over for trial, and was placed on administrative leave from his position at the BIDS/Public Defender for four months during an internal investigation. Mr. Bunce was also booked, fingerprinted, photographed, and subjected to the significant humiliation of a public arrest record which he must now pay to have expunged alongside his attorney fees. Mr. Bunce and his attorney ultimately secured his dismissal.

8.    Mr. Bunce now seeks justice under 42 U.S.C. § 1983 for Defendants malicious and retaliatory violations of his clearly established rights under the First, Fourth & Fourteenth Amendments to the United States Constitution. Mr. Bunce will also ask the Court to take supplemental jurisdiction over his state law claims against Defendants, with his K.S.A. 12-105b(d) Kansas Tort Claims Act notice having expired.

## STATEMENT OF FACTS

Plaintiff hereby adopts by reference paragraphs one through eight (1-8) inclusive, and, in addition, further states and alleges:

3

### *The Preliminary Examination Hearing of Ashley Dempsey*

9.      On October 29, 2024, Ashley Dempsey was arrested and charged with one felony count of possession of methamphetamine and one misdemeanor count of possession of drug paraphernalia, to-wit: a meth pipe, in Saline County, Kansas, in case number SA-2024-CR-711.

10.      On November 14, 2024, a preliminary hearing was held on that matter. Officer Heather Surface testified that on October 29, 2024, a search incident to Ms. Dempsey's arrest revealed a clear glass pipe and small clear plastic tube protruding from Ms. Dempsey's bra, each containing a crystalline residue the officer believed to be methamphetamine. Ms. Dempsey attempted to claim that the materials located on her person were a variety of bath salts called "Shazzle" purchased at a local shop nearby. A field test, using a NARTEC methamphetamine test kit, returned a presumptive positive result indicating the material present was indeed methamphetamine.

11.      Following Officer Surface's testimony, the Assistant Public Defender, Lynn Burke, called Micah Bunce to the stand. After leaving the Salina Police Department in 2018, Mr. Bunce was employed as a Special Investigator for the Kansas Board of Indigent Defense Services, assigned to Saline County to assist indigent defendants with constitutional defense rights. Bunce testified that at defense counsel's request, he attempted to locate "Shazzle" in local shops nearby, which he was unable to locate.

12.      Assistant Public Defender Burke, then inquired of Bunce about whether during his tenure at as a Saline Police Department officer, six years prior, Bunce had access to or familiarity with tests that could indicate the presence of "bath salts." Bunce testified that when he was an officer with the SPD, between 2015 and 2018, SPD had NARTEC brand test kits.  He further testified that the different tests could be used to determine the presence of bath salts.

4

```
Q.    Okay. Um, if you were an officer, and you were an officer

for many years, and someone told you that they had

bath salts, was there a way that you could test that?

A     During my employment with the Salina police department,

there was. We had different tests that we could use.

Q.    Was it a NARTEC test?

A.    Yes, ma'am.
```

This testimony, which was immaterial to the outcome of Ms. Dempsey's preliminary hearing and finding of probable cause for possession of methamphetamine, became the pretext for Defendants' retaliatory and malicious prosecution of Mr. Bunce. Moreover, Ms. Burke had conceded at the conclusion of the preliminary hearing that there was probable cause to bind her client, Ms. Dempsey, over for trial.

### *Bunce 'the Clown'*

13.    Nearly three months after Dempsey's preliminary hearing, internal communications between members of the SPD and the Saline County Attorney's Office revealed a disturbing pattern of hostility, ridicule, and personal animus toward Bunce. Through Kansas Open Records Act disclosures, emails were uncovered in which SPD Captain James Feldman, Deputy County Attorney Richard James, and SPD Sgt. Andrew Zeigler circulated messages about Bunce under the subject line "Bunce the Clown." These emails discussed strategies to prosecute Bunce and expressed an intent to cause professional harm, including efforts and a desire to get Bunce terminated from his position with BIDS/Public Defender.

14.    It began when Captain James 'Mike' Miller sent the following email:

On Feb 5, 2025, at 3:39 PM, Miller, James <james.miller@salina.org> wrote:

All,

   I spoke with Mikayla about this and I thought she said Lonna was involved.  There was a case in District Court where former Officer Bunce took the stand for the Public Defender and testified about using a Nartec Field Test to test potpourri when he was working here.  I would like to know when this was and what case it was.  Please send me any case number or anything we can use to identify the trial date and time.

Mike Miller

Captain of Patrol Division

Officer Heather Surface responded:

From: Surface, Heather <heather.surface@salina.org>
Sent: Thursday, February 6, 2025 8:07 AM
To: Miller, James <james.miller@salina.org>
Subject: Re: District Court Case

The case was 2024-32593, prelim was on 11-14-2024 at 10:30. Defendant was Ashley Dempsey and I'm pretty sure he testified that we had NARTEC tests for bath salts. The attorney was trying to argue the substance was not meth because her client claimed the substance I found that tested positive for meth was bath salts.

The jury trial is scheduled for March 25, 2025 at 9:00.

Evidence Technician Evan Londo then sent an email on February 10, 2025, stating he had been researching every case that Mr. Bunce had been a part of as a law enforcement officer.

15.    Captain Feldman and Sgt. Zeigler, along with others, drafted reports containing false and/or unverified assertions and assembled a misleading narrative purporting a perjury charge against Mr. Bunce based upon his testimony in the Ashley Dempsey preliminary hearing. They further engaged in conversations with Deputy County Attorney Richard "Rick" James of the Saline County Attorney's Office to engineer and pursue a charge of perjury against Mr. Bunce – an outcome that foreseeably placed Mr. Bunce's employment with BIDS in jeopardy, as evidenced

6

by the following email sent by Deputy County Attorney Richard James to Captain Feldman and

Sgt. Zeigler:

16.

**From:** James Richard <jamesr@salinecountyks.gov>
**Sent:** Thursday, March 20, 2025 9:55 AM
**To:** Feldman, James <james.feldman@salina.org>
**Cc:** Zeigler, Andrew <andrew.zeigler@salina.org>
**Subject: Bunce the Clown**

Guys,

I outlined what happened with Bunce vis a vis the bath salts. The boss said tell you to send over an affidavit. He's getting conflicting advice, I told him we needed to file perjury charges, Quinn told him he prefers sending a copy to Justin Bravi and Heather Cessna (head of BIDS for Kansas and Bravi's boss), with a warning we're watching him. If we take Quinn's approach, I think it is probably 50/50 they'll fire him. If we take my approach and actually file on him, I think it's a 100% they fire him. I like my approach better, but the boss said he wants to have a meeting with all the lawyers before he makes a decision, but he wanted the affidavit from you to work from. I strongly made my case to Reynolds, but given tomorrow is my last day among you, not sure I have a lot of influence anymore.

RIck

17. At James's request, an affidavit of probable cause was executed by Captain Feldman. Citing Mr. Bunce's testimony from the Dempsey hearing, Captain Feldman stated, in pertinent part, that the SPD never had the ability to test for bath salts, and that NARTEC brand test kits were not used at the Salina Police Department until January of 2019, which was after Bunce left the SPD. Per Feldman, this made Bunce's prior testimony from the Dempsey hearing "perjury."

18.

According to Sgt. Andrew Zeigler of the Salina Police Department, NARTEC test kits were not used at the Salina Police Department until January of 2019 when he was certified as an Instructor through NARTEC Inc. Prior to utilizing NARTEC test kits the Salina Police Department used Sirche brand NARC II test pouches. Sgt. Zeigler was certified as an instructor in the NARC II test pouches on March 15th, 2010. At no time from March 15th, 2010 to present dav has the Salina Police department had a test kit for "bath salts."

However, this affidavit, signed and sworn to by Captain Feldman, **was contrary to his own personal knowledge**, as discussed *infra*.  Nonetheless, Captain Feldman requested a warrant be issued and Micah Bunce charged with the felony crime of perjury.

### *Bad Actors*

19.    Evidence Technician Evan Londo reviewed a limited number of older SPD case files involving Micah Bunce and other officers. After Bunce was charged with perjury and in response to a subpoena, Londo drafted a May 22, 2025 memo stating that SPD had used NARTEC kits **since 2015**, when Bunce was an SPD officer. The memo further stated that, since at least 2015, SPD used NARTEC test kits labeled METH-1, CO-2, and HEROIN/OPIATES, which testimony later established were the kits required to test for bath salts.[1]

20.    Evan Londo's memorandum stated:

[NEXT PAGE]

---

[1] NARTEC President Jeffrey Ware testified that the SPD had the ability to test for bath salts since at least 2015 using the three (3) NARTEC kits – METH-1, CO-2, and HEROIN/OPIATES listed by defendant Londo in his memorandum. See *infra*, pp. 10-11, ¶ 22.

8



### Salina Police Department
#### Memorandum/Officer's Report
#### Detective Division

**TO:** Angie Fuller

**FROM:** Evan Londo

**REF:** Subpoena of Business Records

**DATE:** 22 May 2025

In reference to the subpoena regarding Salina County Court Case Number 25CR230, the following information is intended to satisfy the requests of the records to be produced from Line 2:

   a. The SPD does not maintain an ordering record of what/when field test kits are purchased.
   b. The SPD has used both Nartec and NIK for their drug testing providers since January 2015 to present. The SPD currently uses Nartec METH-1 to field test for methamphetamines and methylene-dioxymethylamphetamine (MDMA), CO-2 to field test for, and HEROIN/OPIATES to field test for heroin or other opiates. NIK was used to field test marijuana; however, those field tests are no longer purchased as of 2022.
   c. The SPD has only purchased the METH-1, CO-2, and HEROIN/OPIATES test kits from January 2015 to present.
   d. There have been no representatives that have met with SPD staff regarding testing of substances.
   e. Test kit manuals have been provided with this request.

Evan M. Londo
Crime Scene & Evidence Technician
Salina Police Department
785-833-8567
Evan.londo@salina.org

21.     Despite a memo he wrote less than two (2) months earlier, Londo testified under oath at Bunce's July 10, 2025, preliminary hearing for perjury that the SPD did not have NARTEC kits before 2019, echoing earlier testimony from his supervisor, Captain Feldman.

Q. Okay.  Um, now, Captain Feldman testified that you -- that the Salina Police Department began using NARTEC in 2019; is that correct?

A. That was before my employment, but, yes, sir.

22.     Under cross-examination by Bunce's criminal defense attorney, Mr. Lindberg, and after being confronted with his own memo, defendant Londo changed his testimony:

9

Q. (By Mr. Lindberg) Mr. Londo, can you read
   subparagraph B of your memorandum to the Court?
A. Yes, sir.
        The SPD has used both NARTEC and NIK for their
   drug testing provider since January 2015 to present.


Q. And so were you mistaken on your testimony, then,
   about 2019, and it was actually 2015, when we
   started purchasing NARTEC?
A. It was before my employment, as my employment
   started in '22.  Yeah.  I saw stuff in the field
   reports that were mentioning NARTEC and other test
   kits, which ones they had re-branded through, I'm
   not sure of.  It's just, kind of, what I've heard
   from other officers and based off their reports from
   that time period.
Q. And so you reviewed reports that would have been
   prior to 2019, that would have indicated the use of
   NARTEC; is that fair?
A. Correct.

Londo never corrected his emails, Sgt. Zeigler's report, his own report, nor informed Captain Feldman, and was "mistaken" during his testimony in Mr. Bunce's preliminary hearing.

23.    One of the reports referenced in the above transcript was the report of Sgt. Andrew Zeigler. Defendant Zeigler, in his April 2025 report, stated that he and Captain Larson were the first certified instructors for NARTEC with the Salina Police Department, having been certified on January 22, 2019. He further stated in his report, "[t]his would make it impossible for Bunce to ever use a NARTEC test kit while employed with the Salina Police Department…During that time the department never at any point had a test kit for "bath salts."

24.

At the time Det. (Cpt) Larson and I were the first certified instructors for NARTEC Test Kits within the Salina Police Department. We were certified on January 22nd, 2019. This would make it impossible for Bunce to ever use a NARTEC test kit while employed with the Salina Police Department. Additionally, the SPD utilizes only 3 NARTEC kits, Methamphetamine, Cocaine and Heroin, and have never possessed any other type.

25.     Despite Sgt. Zeigler's report to the contrary, the SPD did in fact have NARTEC test kits prior to 2019, and as far back as 2015, if not before. Most significantly, this would have been during the time Micah Bunce was an officer with the SPD.

26.     Additionally, SPD officers had the ability to use the test kits from NARTEC - labeled METH-1, CO-2, and HEROIN/OPIATES – to test for bath salts. The President of NARTEC Inc., Jeffrey Ware, testified at the preliminary hearing that the SPD had the requisite test kits to test for bath salts since at least 2015:

[NEXT PAGE]

11

DIRECT EXAMINATION

BY MR. LINDBERG:

Q. Good afternoon, Mr. Ware.  Can you state your name and spell it for the record?

A. Jeffrey Ware.  J-E-F-F-R-E-Y, W-A-R-E.

Q. And, Mr. Ware, how are you currently employed?

A. I'm sorry, what?

Q. How are you currently employed?

A. Where am I employed?

Q. Yes.

A. I'm the president of NARTEC Inc.

Q. And, Mr. Ware, does your family own NARTEC Inc.?

A. Yes.

Q. Mr. Ware, if Salina Police Department had the Meth-1 kit, or Meth-1, the CO-2, and the heroin/opiates kits from 2015 to the current date, they could test for bath salts; is that correct?

A. Yes.

Q. If a person was to say in 2015 or 2016, even 2017 and 2018, that Salina Police Department could have tested for bath salts with the kits that they had, would that answer have been "yes"?

A. Yes.

27.    Sgt. Zeigler -also a supervisor – and his false statements were relied upon as core factual support for the affidavit seeking to criminally charge Mr. Bunce with perjury. His conduct materially advanced a misleading narrative and substantially contributed to the initiation of a baseless perjury prosecution.

28.    Deputy County Attorney Richard James participated in internal communications – including emails referring to Mr. Bunce as "Bunce the Clown" – that revealed not only disdain for Bunce but an expressed desire to see him fired from his position with BIDS. Per Captain Feldman's report, James provided the SPD with a transcript of the Ashley Dempsey preliminary hearing. James then solicited a probable cause affidavit from the Salina Police Department with the goal of securing Mr. Bunce's termination.

29.    On April 4, 2025 – at Deputy County Attorney James's request – Captain Feldman executed the aforementioned sworn affidavit seeking to charge Mr. Bunce with felony perjury. The affidavit relied entirely on hearsay from subordinates and omitted significant exculpatory information.

30.    In support of his sworn affidavit, Captain Feldman stated Sgt. Zeigler informed him of the information. Captain Feldman did not verify the information. Captain Feldman further failed to recognize that not only was the unverified information provided to him inaccurate and contrary to his known knowledge, constructive or actual, but was also premised upon inadequate training of Salina Police Department personnel as to modalities available for bath salt testing.

31.    Moreover, Captain Feldman had personal knowledge, despite his attempts to blame Zeigler, that the SPD did in fact have NARTEC test kits prior to 2019.

32.    Upon information and belief, Captain Feldman started with the Salina Police Department in 1994.  Captain Feldman served as a Patrol Officer, Master Patrol Officer, Criminal

Detective, and Drug Task Force Detective. Captain Feldman was promoted to Sergeant in June of 2014 and served as Criminal Detective Sergeant and Patrol Sergeant. He 'left the streets' when was promoted to Lieutenant in January of 2019, and served in Internal Affairs, and in Recruiting and Hiring with the Police Department.

33.    At the preliminary hearing Captain Feldman admitted under oath to having knowledge that NARTEC kits were used by the SPD when he was 'on the streets.'

```
Q. When did you begin employment with Salina Police
   Department?
A. 1994.
Q. '94.  So you've been here a while?
A. A little while.
Q. You're on the street?
A. Uh, not for a long time.
Q. When you were on the street, did you have any such
   test kits?
A. We had NARTEC and whatever was before NARTEC.
```

34.  Captain Feldman further conceded in his testimony at Mr. Bunce's preliminary hearing that he did not verify the information in Zeigler's report, nor in his affidavit, because he trusted the people that work for him.

```
Q. And you did nothing to corroborate those statements?
A. I trust the people I have working for me.
```

Furthermore, when confronted with the testimony of the NARTEC president, Captain Feldman conceded that he did not have any reason to doubt NARTEC president Jeffrey Ware's testimony:

14

Q. Captain Feldman, if NARTEC was to testify and say
that Salina PD had a relationship with them in 2015,
would you have any reason to doubt that?

A. No.

### *The Aftermath*

35.    An affidavit of probable cause was presented, and Bunce eventually was charged with the crime of perjury. He was booked, fingerprinted, and photographed and was forced to undergo a preliminary hearing for the perjury charge brought against him.

36.

37.    No reasonable officer or prosecutor could have concluded that Plaintiff's testimony constituted materially false testimony under K.S.A. 21-5903 after the existence of SPD records, Defendant Londo's memorandum, and NARTEC testimony confirming SPD's historical use of NARTEC testing kits.

38.    Despite the Defendants' "investigation" and baseless charges crumbling at Mr. Bunce's preliminary hearing, Micah Bunce was bound over for trial.[2]

---

[2] Under K.S.A. 22-2902(3), the State's burden of proof at a preliminary hearing is only probable cause, not proof beyond a reasonable doubt which is required for conviction. *State v. Washington*, 293 Kan. 732, 733-34, 268 P.3d 475 (2012). To determine whether, the State has met this burden, *a preliminary hearing judge does not pass on credibility*, *and, when evidence conflicts*, the judge *must accept* the version of the testimony most favorable to the State. See *State v. Wilson*, 267 Kan. 530, 535, 986 P.2d 365 (1999), see also *State v. Rozell*, 315 Kan. 295 (2022) (emphasis added).

39. During this time, Mr. Bunce was placed on administrative leave from his position at BIDS for approximately four months while the State of Kansas conducted an internal investigation. He was booked, fingerprinted, photographed and subjected to the humiliation of a public arrest record which he must pay to have expunged. And the stress and reputational damage forced Mr. Bunce to enter professional counseling – all while his wife was simultaneously battling Merkel cell carcinoma.

40. Although Plaintiff ultimately secured dismissal with prejudice of the criminal charge, the dismissal occurred only after Plaintiff—despite the emergence of subpoenaed records, conflicting testimony, corrections to prior investigative assertions, and substantial evidence undermining the factual basis for the perjury allegation—was nevertheless required by the Saline County Attorney's Office to complete approximately 110 hours of professional training courses proposed during settlement discussions. Rather than dismissing the charge once the investigative deficiencies and contradictory evidence became apparent, the County Attorney conditioned dismissal upon Plaintiff undertaking remedial training as though Plaintiff had engaged in professional misconduct.

41. Plaintiff never admitted guilt, entered a plea, stipulated to facts, or accepted any adjudication or finding of criminal responsibility.

42. As a result of the malicious unlawful actions of Salina Police Department personnel and the Saline County Attorney's Office, as well as others, Bunce suffered a malicious and retaliatory criminal prosecution, unlawful seizure, and public humiliation. His arrest, booking, and mugshot caused significant damage to his reputation within the legal community. His role as a BIDS investigator — which depends critically on his credibility — was undermined. He suffered emotional distress, anxiety, fear for his job, and ongoing reputational harm. He continues to face

consequences from the publicly accessible arrest record, which he must now pursue expungement to remedy. These injuries result directly from the abusive and malicious conduct of the involved employees and agencies, acting under color of law.

## THE PARTIES, JURISDICTION & VENUE

Plaintiff hereby adopts by reference paragraphs one through forty-two (1-42) inclusive, and, in addition, further states and alleges:

43.     Plaintiff, MICAH BUNCE, is an adult individual and a citizen of Kansas, residing in Salina, Saline County.

44.     Defendant JAMES FELDMAN was at all times relevant herein, and remains at the time of this filing, a Captain with the Salina, Kansas Police Department. Captain Feldman is a citizen of the State of Kansas and upon belief maintains his principal residence in Saline County, Kansas. Captain Feldman is being sued in his individual capacity for plaintiff Bunce's 42 U.S.C. § 1983 and state law claims. Defendant Feldman may be served with process personally.

45.     Defendant ANDREW ZEIGLER was at all times relevant herein a Sergeant with the Salina, Kansas Police Department. Upon information and belief, Zeigler is now a Lieutenant with the SPD. Zeigler is a citizen of the State of Kansas and upon belief maintains his principal residence in Saline County, Kansas. Sgt. Zeigler is being sued in his individual capacity for plaintiff Bunce's 42 U.S.C. § 1983 claims and state law claims. Defendant Zeigler may be served with process personally.

46.     Defendant EVAN LONDO was at all times relevant herein, and remains at the time of this filing, an Evidence Technician with the Salina, Kansas Police Department. Defendant Londo is a citizen of the State of Kansas and upon belief maintains his principal residence in Saline

17

County, Kansas. Defendant Londo is being sued in his individual capacity for plaintiff Bunce's 42 U.S.C. § 1983 and state law claims. Defendant Londo may be served with process personally.

47.     Defendants Feldman, Zeigler and Londo were at all times relevant herein employees of the Salina Kansas Police Department and thus agents, officers, servants, and employees of the City of Salina. Feldman and Zeigler were also supervisors in the Salina Police Department.

48.     County Attorney John Reynolds was at all relevant times the elected County Attorney of Saline County, Kansas, and the supervising official over Defendant Richard James.

49.     Defendant RICHARD JAMES was at all times relevant herein a Deputy County Attorney of Saline County, Kansas. Deputy County Attorney Richard James is a citizen of the State of Kansas and upon belief maintains his principal residence in Clay County, Kansas. Upon information and belief, Deputy County Attorney James has retired, but this claim is being brought relative to his capacity at the time of the events, and referred to as such herein.  Defendant James is being sued in his individual capacity for plaintiff Bunce's 42 U.S.C. § 1983 claims and state law claims. Defendant James may be served with process personally.

50.     Defendant James was at all times material hereto a Deputy Attorney within the Saline County, Kansas Attorney's Office, and thus, a subordinate of County Attorney Reynolds and an agent, deputy, servant, and employee of the Saline County Attorney's Office, and thus an employee of Saline County, Kansas.

51.     Jurisdiction of this action is conferred by 28 U.S.C. § 1331, which provides original "federal question" jurisdiction over all civil actions arising under the United States Constitution and laws or treaties of the United States. Jurisdiction is further conferred by 28 U.S.C. § 1343(a)(3), which provides for original jurisdiction in suits authorized by 42 U.S.C. § 1983.

18

52. Plaintiff Bunce's claims for damages herein are authorized by (1) 42 U.S.C. § 1983, which provides for redress for the deprivation under color of any statute, ordinance, regulation, custom or usage of any state or territory of any rights, privileges or immunities secured to all the citizens or persons within the jurisdiction of the United States; (2) The First, Fourth and Fourteenth Amendments to the United States Constitution; and (3) 42 U.S.C. § 1988, which allows the prevailing party to collect a reasonable attorney's fee as costs in any action or proceeding to enforce 42 U.S.C. § 1983.

53. To the extent Mr. Bunce is also presenting state law tort claims, plaintiff requests this Honorable Court accept supplemental jurisdiction over these claims pursuant to 28 U.S.C. §1367(a).

54. Upon belief the notice provisions of K.S.A. 12-105b(d) apply to some or all of the defendants in this action as a "municipality" or an employee thereof, as defined under the relevant provisions of the Kansas Tort Claims Act, found at K.S.A. 75-6102. Plaintiff has fully complied with all conditions precedent to bringing this action under the notice provisions of K.S.A. 12-105b(d) and the Kansas Tort Claims Act, K.S.A. 75-6101 et seq.

55. Venue is proper in this Court pursuant to 28 U.S.C. §1391, as Defendants are citizens of Kansas and Defendants' actions as well as the events giving rise to the claims all occurred in Salina, Saline County, Kansas.

56. Plaintiff now seeks justice under 42 U.S.C. §1983 and Kansas law for malicious and recklessly indifferent violations of his clearly established rights under the First, Fourth & Fourteenth Amendments to the United States Constitution, and violations under Kansas law.

19

## CONDUCT OF DEFENDANT JAMES

57.    Defendant James's conduct giving rise to the claims in this Count was investigative and administrative in nature, and does not constitute prosecutorial advocacy protected by absolute prosecutorial immunity. Specifically:

(a) Defendant James's participation in internal email communications with SPD officers Feldman and Zeigler — including communications discussing prosecution strategy in terms of its likelihood of causing Plaintiff Bunce's employment termination — constitutes investigative coordination with law enforcement personnel, not advocacy before a tribunal, and is therefore subject only to qualified immunity. See *Burns v. Reed*, 500 U.S. 478 (1991); *Buckley v. Fitzsimmons*, 509 U.S. 259 (1993).

(b) Defendant James's solicitation of a probable cause affidavit from SPD — directing law enforcement personnel to gather and assemble information to support a charging document — constitutes the exercise of an investigative and administrative function, not a prosecutorial function, and is subject only to qualified immunity. See *Burns v. Reed*, 500 U.S. 478 (1991).

(c) Defendant James's provision of the Dempsey preliminary hearing transcript to SPD personnel for use in building a case against Plaintiff constitutes the furnishing of investigative resources to law enforcement and is an investigative, not prosecutorial, act subject only to qualified immunity.

(d) Defendant James's conduct was undertaken not in furtherance of the State's legitimate prosecutorial interest in vindicating the law, but for the purpose of achieving Plaintiff's termination from employment — a purpose wholly outside the proper function of a prosecutor and outside the scope of any immunity. As Defendant James stated explicitly in

20

his own written communication, the goal of the prosecution was to cause Plaintiff to lose his job. The use of prosecutorial apparatus for such a purpose is not conduct "intimately associated with the judicial phase of the criminal process" within the meaning of *Imbler v. Pachtman*, 424 U.S. 409 (1976).

58.    Defendant James retired from the Saline County Attorney's Office on March 21, 2025. The criminal complaint charging Plaintiff with perjury was not filed until April 17, 2025.

59.    All of Defendant James's conduct relevant to this action occurred before the initiation of formal proceedings against Plaintiff and before any probable cause determination was made. Such pre-charging conduct — particularly investigative coordination with law enforcement personnel from a separate agency — is not protected by absolute prosecutorial immunity. See *Buckley v. Fitzsimmons*, 509 U.S. 259 (1993); *Burns v. Reed*, 500 U.S. 478 (1991).

60.    Accordingly, Defendant James's conduct is governed exclusively by the qualified immunity standard applicable to all government officials. For the reasons set forth herein, Defendant James is not entitled to qualified immunity because the constitutional rights he violated were clearly established at the time of his conduct, and no reasonable official could have believed that coordinating a retaliatory criminal prosecution for the express purpose of causing a truthful witness to lose his employment was constitutionally permissible.

61.    James's conduct as a supervisor ignored the suggestion of subordinate attorneys, specifically Quinn Hughes - the prosecutor at the Dempsey hearing – to not charge Mr. Bunce. Rather than acting as a minister of justice, James employed the powers of his office to advance a retaliatory effort designed to discredit Plaintiff, strip him of his livelihood, and force his removal from employment.

21

62.    Prior to his employment with Saline County, Defendant James had previously been named in federal civil-rights litigation[3] arising from allegations that he personally participated in affidavit-supported criminal charging conduct while functioning in an investigative or complaining-witness capacity. Regardless of the disposition of those allegations, the prior litigation placed James on notice regarding the constitutional implications and risks associated with personally participating in investigative functions, probable-cause affidavit preparation, and warrant-related charging conduct.

63.    Upon information and belief, Defendant James's prior involvement in federal civil-rights litigation concerning affidavit-supported criminal charging practices was discoverable by the defendant County through publicly available court records prior to the events described herein.

## FEDERAL LAW CLAIMS

**FIRST COUNT:**    *Fourth Amendment — Malicious Prosecution / Unlawful Seizure (42 U.S.C. § 1983) Against Defendants Feldman, Zeigler, Londo, and James, in Their Individual Capacities*

64.    Plaintiff hereby adopts by reference paragraphs one through sixty-three (1-63) inclusive, and, in addition, further states and alleges:

65.    At all times relevant to this action, Defendants James Feldman, Andrew Zeigler, Evan Londo, and Richard James (collectively, the "Individual Defendants") acted under color of state law in their respective capacities as Captain, Sergeant, Evidence and Crime Scene Technician of the Salina Police Department, and Deputy Saline County Attorney.

---

[3] The federal civil rights litigation referenced is *Pamela Curtis v. Board of County Commissioners of Clay County, Kansas, Richard James Clay County Attorney*, case no. 5:12-cv-04028-JTM-KMH, removed to federal court and filed March 9, 20212. Clay Center is the county seat of Clay County, approximately 60 miles from Salina, Saline County, Kansas.

66.     On or about April 4, 2025, at the request of Defendant James, Defendant Feldman executed a sworn Affidavit of Probable Cause ("Affidavit") seeking to charge Plaintiff Micah Bunce with the felony offense of perjury, in violation of K.S.A. 21-5903.

67.     The Affidavit was fundamentally and fatally defective. It was based entirely upon hearsay representations from Defendants Zeigler and Londo, neither of which Defendant Feldman independently verified, investigated, or corroborated. When questioned under oath at Plaintiff's preliminary hearing on July 10, 2025, Defendant Feldman admitted that the information contained in his sworn Affidavit was "based solely on what other people told" him and that he did nothing to corroborate those statements, stating only that he trusted the people working for him.  Moreover, Feldman had personal knowledge that the assertions he made were false from his time 'on the streets,' prior to being promoted.

68.     The factual assertions in the Affidavit were false. The Affidavit stated, inter alia, that "NARTEC test kits were not used at the Salina Police Department until January of 2019" and that "[a]t no time from March 15th, 2010 to the present day has the Salina Police department [sic] had a test kit for 'bath salts.'" Both assertions were false.

69.     Defendant Londo, on whose research Defendant Feldman 'relied,' had himself written a memorandum dated May 22, 2025 — less than six weeks before the preliminary hearing for Bunce's case — in direct response to a business records subpoena, affirmatively stating that "The SPD has used both Nartec and NIK for their drug testing providers since January 2015 to present." This memorandum, authored by Defendant Londo himself, directly contradicted the narrative advanced in Defendant Feldman's Affidavit and in Defendant Londo's and Defendant Feldman's own subsequent hearing testimony.

23

70.    Jeffrey Ware, President of NARTEC Inc., testified at Plaintiff's preliminary hearing that the Salina Police Department had been receiving NARTEC test kits since 2015, and that the combination of test kits available to SPD during the period of Plaintiff Bunce's employment (2015–2018) provided SPD the ability to test for bath salts.

71.    Defendant Zeigler's investigative report, upon which Defendant Feldman's Affidavit was also based, contained multiple false assertions, including the claim that Defendant Zeigler and another officer were "the first certified instructors for NARTEC within the Salina Police Department, having been certified on January 22, 2019," and that this "would make it impossible for Bunce to ever use a NARTEC test kit while employed with the Salina Police Department." These assertions were demonstrably false, unsupported by independent investigation, and contradicted by multiple sources, including SPD records, Defendant Londo's own memorandum and NARTEC's records.

72.    The testimony that formed the predicate for the perjury charge — Plaintiff's testimony at the November 14, 2024, preliminary hearing in *State v. Ashley Dempsey* — was accurate, truthful, and not material to the determination of probable cause in that proceeding. Defense counsel Lynn Burke, who elicited Plaintiff's testimony, herself conceded at the close of the Dempsey preliminary hearing that probable cause existed to bind Ms. Dempsey over for trial on the charge of possession of methamphetamine. Plaintiff's testimony about NARTEC during his tenure six years prior had no bearing on the outcome of that proceeding.

73.    Plaintiff was arrested on April 18, 2025. He was booked, fingerprinted, photographed, and subjected to the public humiliation of a publicly accessible arrest record, which he must now expend personal funds to expunge.

24

74.     The criminal proceedings against Plaintiff were terminated in his favor when the Saline County Attorney's Office dismissed the perjury charge.

75.     The Individual Defendants, acting individually and in concert, caused the initiation and continuation of criminal proceedings against Plaintiff without probable cause and with malice, as evidenced by, inter alia, their internal communications in which they referred to Plaintiff as "Bunce the Clown," expressed an explicit desire to see Plaintiff terminated from his employment with the BIDS/Public Defender's Office, and discussed prosecution strategy in terms of its likelihood of achieving that employment consequence rather than in terms of the sufficiency of evidence or the interests of justice.

76.     As a direct and proximate result of Defendants' conduct, Plaintiff suffered a seizure of his person within the meaning of the Fourth Amendment to the United States Constitution, in violation of rights clearly established at the time of the conduct.

77.     As a direct and proximate result of Defendants' unconstitutional conduct, Plaintiff suffered and continues to suffer damages including, but not limited to: loss of liberty, emotional distress, anxiety, humiliation, damage to professional reputation, lost income, attorney's fees incurred in defending the baseless criminal prosecution, costs of required professional training, costs of professional counseling, and the ongoing burden of an arrest record requiring expungement.

78.     Defendants' conduct was undertaken with malice, or with reckless or callous indifference to Plaintiff's federally protected rights, entitling Plaintiff to an award of punitive damages against the Individual Defendants in their individual capacities.

25

**SECOND COUNT:** *Fourteenth Amendment — Fabrication of Evidence/Due Process (42 U.S.C. § 1983) Against Defendants Feldman, Zeigler, Londo, in Their Individual Capacities*

79. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

80. The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits government officials from fabricating evidence and using materially false evidence to deprive a person of liberty.

81. Defendant Zeigler made materially false assertions in his investigative report, including the false claim that SPD did not obtain or use NARTEC test kits prior to January 2019, and that it was therefore impossible for Plaintiff to have used such kits during his employment. Defendant Zeigler knew or should have known these assertions were false. He failed to conduct basic independent verification that would have immediately revealed their falsity.

82. Defendant Londo made materially false assertions in communications to Defendant Feldman and Defendant Zeigler, reporting that SPD had not possessed NARTEC test kits prior to 2019. Defendant Londo further testified falsely at Plaintiff's preliminary hearing on July 10, 2025, stating in response to the prosecutor's questions that SPD had not been using NARTEC prior to 2019 — testimony that was directly contradicted by Defendant Londo's own memorandum written just weeks earlier, in which he stated that "The SPD has used both Nartec and NIK for their drug testing providers since January 2015 to present."

83. When confronted by defense counsel at the preliminary hearing with his own memorandum, Defendant Londo ultimately conceded that it would be an "incorrect statement" to say that NARTEC was not purchased by the Salina Police Department prior to January 2019.

26

84. Defendant Feldman made materially false assertions in his sworn Affidavit of Probable Cause by including statements he knew to be false, that he had been told were unverified, and that were directly contradicted by documents available to him, including Defendant Londo's own memorandum.

85. The false evidence was submitted to a court of law in support of a criminal charge against Plaintiff, resulting in Plaintiff's arrest and criminal prosecution.

86. Defendants' false evidence was a direct and proximate cause of Plaintiff's deprivation of liberty without due process of law, in violation of the Fourteenth Amendment.

87. Defendants' conduct was undertaken with malice, or with reckless or callous indifference to Plaintiff's federally protected rights, entitling Plaintiff to an award of punitive damages.

**THIRD COUNT:** *First Amendment — Retaliatory Prosecution (42 U.S.C. § 1983) Against Defendants Feldman, Zeigler, Londo, and James in Their Individual Capacities*

88. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

89. The First Amendment to the United States Constitution protects the right to testify truthfully in judicial proceedings and protects against government retaliation for the exercise of that right.

90. On November 14, 2024, Plaintiff testified truthfully and under oath at the preliminary hearing in *State v. Ashley Dempsey*, Case No. SA-2024-CR-711, in the District Court of Saline County, Kansas. Plaintiff's testimony was elicited entirely by defense counsel and concerned his recollection, from his tenure as an SPD officer six years prior, that SPD had NARTEC brand test kits available that could be used to test for bath salts. This testimony was accurate.

27

91.     Plaintiff's testimony was constitutionally protected activity. It was truthful testimony given under oath in a judicial proceeding. It was testimony given in his professional capacity as an investigator for the BIDS/Public Defender's Office — a role that exists to safeguard the Sixth Amendment rights of indigent criminal defendants. The exercise of that role, including testifying on behalf of defense clients, is constitutionally protected.

92.     Shortly after Plaintiff's testimony, Defendant Feldman, acting through Captain James "Mike" Miller of SPD, began investigating Plaintiff's testimony, seeking to identify the specific case in which Plaintiff testified about bath salt testing capability.

93.     Beginning in February 2025, Defendants Feldman, Zeigler, Londo, and James engaged in a coordinated campaign to retaliate against Plaintiff for his testimony, including by soliciting false investigative reports, assembling a misleading narrative, and ultimately causing the filing of a felony perjury charge against Plaintiff.

94.     Defendants' retaliatory motive is documented in their own communications. Defendant Richard James, in an email sent to Defendant Feldman and copied to Defendant Zeigler under the subject line "Bunce the Clown," explicitly discussed the prosecution strategy in terms of its likelihood of causing Plaintiff to lose his employment, stating in substance that filing charges would result in Plaintiff being fired with certainty.

95.     But for Plaintiff's protected testimony, the Individual Defendants would not have initiated or pursued the criminal prosecution against him. The temporal proximity between Plaintiff's testimony on November 14, 2024, and the commencement of the retaliatory investigation shortly thereafter, combined with the explicit documentary evidence of retaliatory motive, establishes the causal connection required under *Hartman v. Moore*, 547 U.S. 250 (2006), and its progeny.

28

96.    The Individual Defendants' retaliatory prosecution chills the exercise of First Amendment rights not only by Plaintiff but by other BIDS investigators, Public Defender personnel, and defense-side witnesses who may be deterred from testifying truthfully in proceedings involving SPD personnel.

97.    As a direct and proximate result of Defendants' retaliatory conduct, Plaintiff suffered the damages set forth herein.

98.    Defendants' conduct was undertaken with malice, or with reckless or callous indifference to Plaintiff's federally protected rights, entitling Plaintiff to an award of punitive damages.

**FOURTH COUNT:** *Monell - Municipal Liability (42 U.S.C. § 1983) Against Defendant City of Salina*

99.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

100.    Defendant City of Salina is a municipality within the meaning of 42 U.S.C. § 1983 and *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

101.    At all relevant times, Defendants Feldman, Zeigler, and Londo were employees, agents, and supervisory personnel of the City of Salina Police Department acting under color of state law and within the scope of their employment.

102.    The constitutional violations suffered by Plaintiff were caused by customs, practices, ratification, and policymaking decisions attributable to the City of Salina.

103.    The investigation into Plaintiff Bunce's testimony was not the isolated conduct of a rogue employee. Rather, the investigation involved coordinated participation among supervisory SPD personnel and occurred with the knowledge, approval, and continued participation of command-level officials.

29

104.   Defendant Feldman, acting in a supervisory capacity within SPD, approved and executed the probable cause affidavit used to initiate felony criminal proceedings against Plaintiff. Moreover, Feldman had personal knowledge that statements in the affidavit were false based on his own experience as an officer.

105.   Prior to the initiation of charges, Defendants Zeigler and Londo prepared reports, memoranda, and investigative communications that:

a.   relied upon incomplete or inaccurate information;

b.   contained materially false or misleading assertions;

c.   failed to account for SPD's historical possession and use of NARTEC field test kits during Plaintiff's tenure with SPD;

d.   omitted material exculpatory information; and

e.   were nevertheless relied upon within SPD as authoritative in support of criminal charges against Plaintiff.

106.   Subpoenaed records confirmed that SPD possessed and utilized NARTEC field test kits during the period in which Plaintiff served as an SPD officer.

107.   Despite the existence of those records, SPD supervisory personnel did not withdraw, correct, supplement, or otherwise reevaluate the information used to support the probable cause affidavit and prosecution of Plaintiff.

108.   Instead, the City, through its supervisory personnel and decisionmakers including Feldman and Zeigler, continued to rely upon false, materially inaccurate and incomplete investigatory information despite the obvious risk that Plaintiff would be subjected to an unconstitutional seizure and prosecution.

109.    The City of Salina, through its supervisory personnel and institutional practices, maintained customs or practices permitting criminal investigations and probable cause determinations to proceed despite:

a.    failures to adequately verify material facts;

b.    personal knowledge contrary to the assertions in the affidavit;

c.    reliance upon incomplete investigatory reviews;

d.    disregard of known exculpatory information; and

e.    continued reliance on materially misleading information after contradictory evidence became known.

110.    The conduct described herein constituted ratification of the investigation and prosecution of Plaintiff despite known deficiencies in the factual basis supporting probable cause.

111.    The constitutional consequences of permitting supervisory personnel to initiate and maintain a felony perjury prosecution based upon false, unverified and materially incomplete investigatory information were obvious and highly predictable.

112.    The City of Salina, through its policymakers and supervisory personnel, acted knowingly or with deliberate indifference to the obvious risk that materially inaccurate or incomplete affidavits and investigatory materials would result in unconstitutional criminal charges, seizures, and prosecutions.

113.    The customs, practices, ratification, and deliberate indifference described herein were moving forces behind the deprivation of Plaintiff's constitutional rights, including:

31

a.      unlawful seizure under the Fourth Amendment;

b.      retaliatory prosecution in violation of the First Amendment; and

c.      malicious prosecution and deprivation of liberty without due process of law.

114.    As a direct and proximate result of the conduct of the City of Salina and its employees, Plaintiff suffered damages including loss of liberty, emotional distress, reputational harm, financial loss, professional injury, and other damages as set forth herein.

115.    In the alternative, the City of Salina failed to adequately train and supervise supervisory and investigative personnel regarding:

a.      the verification of material facts supporting probable cause affidavits;

b.      the obligation to account for and disclose known exculpatory information;

c.      the constitutional limitations governing criminal perjury investigations; and

d.      the initiation and continuation of criminal proceedings based upon false, materially incomplete or misleading investigatory information.

116.    The need for such training and supervision was obvious because supervisory personnel within SPD were entrusted with the authority to investigate alleged criminal conduct, prepare probable cause materials, and initiate felony criminal prosecutions carrying foreseeable constitutional consequences, including arrest, seizure, reputational harm, and deprivation of liberty.

117.    The unconstitutional consequences of failing to adequately train and supervise personnel engaged in felony investigative and affidavit-related functions were highly predictable and patently obvious given that individuals could be falsely arrested and prosecuted.

32

118. Without adequate training and supervision regarding the verification of investigatory information and the treatment of known exculpatory evidence, it was plainly foreseeable that supervisory personnel would rely upon incomplete, inaccurate, or materially misleading information in support of criminal charges.

119. The City of Salina nevertheless failed to implement adequate training, supervision, or safeguards concerning the preparation and review of probable cause materials and the handling of contradictory or exculpatory information.

120. The City's failure to adequately train and supervise its personnel amounted to deliberate indifference to the constitutional rights of persons subjected to criminal investigation and prosecution.

121. The City's deliberate indifference and failure to train were moving forces behind the violations of Plaintiff's constitutional rights and damages described herein.

**FIFTH COUNT:** *Monell - Municipal Liability (42 U.S.C. § 1983) Against Board of County Commissioners of Saline County*

122. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

123. At all relevant times, Defendant Richard James was employed by Saline County, Kansas, as a Deputy County Attorney and was acting under color of state law and within the scope of his employment.

124. Prior to the initiation of formal criminal charges against Plaintiff, Defendant James participated in investigative and administrative activities relating to Plaintiff and Plaintiff's testimony in the Dempsey preliminary hearing.

125. Those activities included, among other things:

33

a.    communicating with Salina Police Department personnel regarding Plaintiff's testimony;

b.    transmitting and discussing transcripts of Plaintiff's testimony;

c.    participating in discussions concerning potential criminal charges against Plaintiff;

d.    encouraging or facilitating the preparation of investigatory materials and probable cause documentation; and

e.    continuing to participate in discussions concerning Plaintiff after the existence of contradictory evidence became known.

126.    The investigation and prosecution of Plaintiff were not the result of isolated conduct by a single employee, but instead involved coordinated participation between supervisory personnel within the Salina Police Department and the Saline County Attorney's Office.

127.    At all relevant times, Defendant James exercised supervisory authority and acted pursuant to authority delegated by the Board of County Commissioners of Saline County, Kansas, with respect to prosecutorial and investigative functions undertaken on behalf of the County.

128.    The Board of County Commissioners of Saline County, Kansas, through its policymakers, customs, practices, ratification, and deliberate indifference, permitted and approved investigative conduct that:

a.    relied upon incomplete or materially inaccurate information;

b.    failed to account for known exculpatory evidence;

c.    permitted the continued pursuit of felony criminal charges despite the existence of contradictory information; and

d.    created an obvious risk of unconstitutional seizure and prosecution.

127. After subpoenaed records and testimony established that SPD possessed and utilized NIK/NARTEC field test kits during Plaintiff's tenure with SPD, the County nevertheless continued participating in and supporting the prosecution of Plaintiff without correction, withdrawal, or reevaluation of the factual basis supporting probable cause.

128. The continued reliance upon materially incomplete and inaccurate investigatory information after contradictory evidence became known constituted ratification of the investigation and prosecution of Plaintiff.

129. Plaintiff does not seek to impose municipal liability upon the County based solely on the discretionary act of filing charges, but upon the County's investigative and administrative participation in developing, soliciting, approving, and continuing reliance upon materially false or incomplete information used to cause Plaintiff's seizure and prosecution.

130. The constitutional consequences of permitting County personnel engaged in investigative and prosecutorial functions to continue pursuing felony criminal charges based upon materially incomplete or misleading information were obvious and highly predictable.

131. The Board of County Commissioners of Saline County, Kansas, through its policymakers and supervisory personnel, acted knowingly or with deliberate indifference to the obvious risk that materially inaccurate or incomplete investigatory information would result in unconstitutional criminal charges, seizures, and retaliatory prosecutions.

132. The customs, practices, ratification, and deliberate indifference described herein were moving forces behind the violations of Plaintiff's constitutional rights, including:

a.     unlawful seizure under the Fourth Amendment;

b.     retaliatory prosecution in violation of the First Amendment; and

c.     malicious prosecution and deprivation of liberty without due process of law.

133.    As a direct and proximate result of the conduct of the Board of County Commissioners of Saline County, Kansas, and its employees and agents, Plaintiff suffered damages including loss of liberty, emotional distress, reputational harm, financial loss, professional injury, and other damages as set forth herein.

134.    In the alternative, the Board of County Commissioners of Saline County, Kansas acted with deliberate indifference to the obvious constitutional risks associated with permitting prosecutorial personnel to participate directly in investigative and charging functions without adequate supervision, safeguards, limitations, or institutional review.

135.    The need for such supervision and safeguards was obvious because prosecutorial personnel exercising investigative or complaining-witness functions possess the ability to influence criminal charging decisions, probable cause determinations, arrest warrants, and the deprivation of individual liberty.

136.    Prior to the events described herein, Defendant Richard James had previously been named in publicly filed federal civil-rights litigation arising from allegations concerning affidavit-supported criminal charging conduct undertaken while functioning in an investigative or complaining-witness capacity. The prior litigation concerned allegations that Defendant James participated personally in the preparation or use of materially inaccurate information in support of criminal process.

137.    Regardless of the disposition of the allegations asserted in that prior litigation, the existence of the publicly filed federal lawsuit underscored the obvious constitutional risks associated with permitting prosecutorial personnel to participate directly in investigative, affidavit-related, or warrant-related functions without adequate supervision or institutional safeguards.

138.    Despite those obvious constitutional risks, the Board of County Commissioners of Saline County failed to implement adequate safeguards, supervisory limitations, or institutional review mechanisms governing the participation of prosecutorial personnel in investigative and affidavit-supported charging activities.

139.    The County's deliberate indifference to those obvious constitutional risks created a foreseeable and highly predictable risk that prosecutorial personnel would participate in or facilitate criminal charging decisions based upon materially incomplete, inaccurate, or misleading investigatory information.

140.    The unconstitutional consequences of failing to adequately supervise or limit prosecutorial participation in investigative and affidavit-related functions were highly predictable and patently obvious.

141.    The Board of County Commissioners of Saline County's deliberate indifference, failure to supervise, and failure to implement adequate safeguards were moving forces behind the violations of Plaintiff's constitutional rights described herein, including his unlawful seizure, retaliatory prosecution, and deprivation of liberty without due process of law.

**SIXTH COUNT:**    *Civil Rights Conspiracy (42 U.S.C. § 1983) Against Defendants Feldman, Zeigler, Londo, and James in Their Individual Capacities*

142.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

143.    Beginning no later than February-March 2025, Defendants Feldman, Zeigler, Londo, and Richard James, acting individually and in concert with one another and with others whose identities are to be determined through discovery, entered into an agreement and conspiracy to deprive Plaintiff of his clearly established constitutional rights, including his rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution.

144.    In furtherance of this conspiracy, the Individual Defendants committed the following overt acts, among others:

(a) Defendant Feldman initiated an investigation into Plaintiff's truthful court testimony, motivated by hostility toward Plaintiff's role as a BIDS/Public Defender investigator;

(b) Defendant Londo, at the direction of Defendants Feldman and Zeigler, researched SPD evidence records in an attempt to find evidence against Plaintiff and reported false and misleading conclusions to his co-conspirators;

(c) Defendant Zeigler authored a false and misleading investigative report containing fabricated assertions about the unavailability of NARTEC test kits prior to 2019, which report he knew or should have known was false;

(d) Defendant Richard James solicited a probable cause affidavit from SPD, provided a hearing transcript to SPD to be used against Plaintiff, and communicated with Defendants Feldman and Zeigler regarding prosecution strategy aimed at achieving Plaintiff's termination;

(e) Defendant Feldman executed a sworn Affidavit of Probable Cause based on unverified, false, and misleading information furnished by his co-conspirators, resulting in the filing of felony charges against Plaintiff;

(f) Defendants communicated internally about Plaintiff using the subject line "Bunce the Clown," expressing personal animus and retaliatory intent;

(g) The conspirators expressed in writing that their goal was to see Plaintiff fired from his position at the BIDS/Public Defender's Office, not to vindicate any genuine law enforcement interest.

145.    As a direct and proximate result of the conspiracy, Plaintiff was arrested, prosecuted, and damaged as set forth herein.

146.    Each co-conspirator is jointly and severally liable for the damages caused by the conspiracy.

147.    Defendants' conduct was undertaken with malice, or with reckless or callous indifference to Plaintiff's federally protected rights, entitling Plaintiff to an award of punitive damages.

## STATE LAW CLAIMS

**SEVENTH COUNT:** *Malicious Prosecution (Kansas Common Law) Against Defendants Feldman, Zeigler, Londo, and James, Individually, and Against Defendants City of Salina and Board of County Commissioners of Saline County*

148.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

149.    Plaintiff has complied with all conditions precedent to this action, including the submission of a notice of claim pursuant to K.S.A. 12-105b(d) to the City of Salina and Saline County on or about December 12, 2025. More than 120 days have elapsed since submission of said notice without resolution.

150.    Under Kansas law, a claim of malicious prosecution requires: (1) the defendant initiated, continued, or procured a criminal proceeding against the plaintiff; (2) the proceeding was terminated in the plaintiff's favor; (3) the defendant lacked probable cause to initiate or continue the proceeding; (4) the defendant acted with malice; and (5) the plaintiff suffered damages.

151.    Defendant Feldman initiated the criminal proceeding against Plaintiff by executing a sworn Affidavit of Probable Cause on or about April 4, 2025, causing the filing of a felony

perjury charge in Case No. SA-2025-CR-000230. Said affidavit contained statements known by Feldman to be false.

152. Defendant Richard James procured and facilitated the criminal proceeding by soliciting the Affidavit from Defendant Feldman, providing the preliminary hearing transcript for use against Plaintiff, and communicating with SPD regarding prosecution strategy.

153. Defendants Zeigler and Londo substantially contributed to and facilitated the criminal proceeding by furnishing false and misleading information that formed a portion of the factual basis for Defendant Feldman's Affidavit.

154. The criminal proceeding terminated in Plaintiff's favor when the Saline County Attorney's Office dismissed the perjury charge.

155. Probable cause was absent. The sole factual predicate for the charge — that Plaintiff falsely testified about SPD's brand of test kits and testing capabilities — was demonstrably false: Plaintiff's testimony was accurate, as confirmed by NARTEC's own president and by Defendant Londo's own memorandum.

156. Defendants acted with malice. Their internal communications, including emails circulated under the subject line "Bunce the Clown," reflect personal animus toward Plaintiff, a desire to cause his professional termination, and a deliberate choice to pursue criminal charges not on the basis of evidence but on the basis of resentment toward Plaintiff's role as a defense-side investigator.

157. Defendants Feldman, Zeigler, and Londo acted within the course and scope of their employment with the City of Salina at the time of the relevant conduct, rendering the City of Salina vicariously liable under the Kansas Tort Claims Act.

158.    Defendant Richard James acted within the course and scope of his employment with Saline County at the time of the relevant conduct, rendering the Board of County Commissioners of Saline County vicariously liable under the Kansas Tort Claims Act.

159.    As a direct and proximate result of Defendants' malicious prosecution, Plaintiff suffered and continues to suffer damages as set forth herein.

**EIGHTH COUNT:**  *Abuse of Process (Kansas Common Law) Against Defendants Feldman, Zeigler, Londo, and Richard James, Individually, and Against Defendants City of Salina and Board of County Commissioners of Saline County*

160.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

161.    Under Kansas law, abuse of process requires: (1) that the defendant made an improper, unwarranted, or perverted use of process — a use neither warranted nor authorized by the process; (2) an ulterior motive or purpose in exercising such improper use of process; and (3) damages to the plaintiff as a result thereof.

162.    Defendants caused the issuance and use of criminal process — specifically, a felony complaint against Plaintiff.

163.    Defendants used that criminal process for purposes for which it was not designed and for which it is not warranted. The purpose of the criminal perjury statute is to protect the integrity of judicial proceedings by punishing those who intentionally provide false testimony on material matters. Defendants did not use the criminal process for that purpose. Instead, as documented in their own written communications, Defendants used the criminal process as a tool to achieve Plaintiff's termination from his employment with the BIDS/Public Defender's Office, to punish Plaintiff for his role as a defense-side investigator who regularly challenged SPD work product, and to intimidate Plaintiff and similarly situated defense investigators.

41

164.    Defendant Richard James stated explicitly in writing that filing charges against Plaintiff would be "100%" likely to cause his firing. This statement, and the surrounding communications, make plain that the criminal process was being deployed not to vindicate the law but to accomplish a collateral employment objective — precisely the "improper use" that defines abuse of process.

165.    Defendants acted with an ulterior motive, as set forth above.

166.    As a direct and proximate result of Defendants' abuse of process, Plaintiff suffered damages including arrest, booking, public humiliation, professional harm, administrative leave, required completion of training courses, counseling expenses, attorney's fees, emotional distress, and ongoing reputational harm.

167.    Defendants Feldman, Zeigler, and Londo acted within the course and scope of their employment with the City of Salina, rendering the City of Salina vicariously liable under the Kansas Tort Claims Act.

168.    Defendant Richard James acted within the course and scope of his employment with Saline County, rendering the Board of County Commissioners of Saline County vicariously liable under the Kansas Tort Claims Act.

**NINTH COUNT:**    *Intentional Infliction of Emotional Distress (Kansas Common Law) Against Defendants Feldman, Zeigler, Londo, and James, Individually, and Against Defendants City of Salina and Board of County Commissioners of Saline County*

169.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

170.    Under Kansas law, a claim of intentional infliction of emotional distress requires: (1) the defendant's conduct was intentional or in reckless disregard of the plaintiff; (2) the conduct

42

was extreme and outrageous; (3) a causal connection existed between defendant's conduct and plaintiff's mental distress; and (4) plaintiff's mental distress was extreme and severe.

171.    Defendants' conduct was intentional and deliberate. They made a calculated decision to pursue a felony criminal prosecution against a man whose testimony they knew, or recklessly disregarded, to be truthful, for the express purpose of causing him to lose his livelihood.

172.    Defendants' conduct was extreme and outrageous. It goes beyond all possible bounds of decency and is utterly intolerable in a civilized community for law enforcement officers and prosecutors — who are entrusted with the power of the State and sworn to uphold the law — to fabricate a criminal prosecution against a truthful witness for the purpose of terminating his employment, while internally mocking him as "the Clown." This conduct is made all the more outrageous by the fact that Defendants knew, or recklessly disregarded, that Plaintiff's wife was simultaneously battling Merkel cell carcinoma, a rare and aggressive cancer, and that the baseless prosecution forced Plaintiff to devote his time and resources to defending against fabricated criminal charges rather than supporting his wife through cancer treatment.

173.    As a direct and proximate result of Defendants' outrageous conduct, Plaintiff suffered and continues to suffer severe emotional distress, including anxiety, fear, humiliation, anger, and professional apprehension, necessitating professional counseling, which he was compelled to seek during the pendency of the wrongful prosecution.

174.    Defendants acted within the course and scope of their respective employment, rendering Defendants City of Salina and Saline County vicariously liable.

43

**TENTH COUNT:**    *Civil Conspiracy (Kansas Common Law) Against Defendants Feldman, Zeigler, Londo, and James, Individually*

175.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

176.    Under Kansas law, civil conspiracy requires: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof.

177.    Defendants Feldman, Zeigler, Londo, and Richard James, acting individually and in combination with one another and with others to be identified through discovery, reached a meeting of the minds on a course of action designed to accomplish the unlawful objective of destroying Plaintiff's career through a fabricated criminal prosecution.

178.    The object of the conspiracy — causing Plaintiff's termination from public employment through criminal charges known to be baseless — constitutes an unlawful purpose.

179.    The conspiracy was accomplished through the unlawful means described herein, including the fabrication of investigative reports, the submission of a false sworn affidavit, and the solicitation and pursuit of criminal charges.

180.    The overt acts in furtherance of the conspiracy are set forth throughout this Complaint and include, without limitation, the acts described above.

181.    Each conspirator is jointly and severally liable for the acts of his co-conspirators taken in furtherance of the conspiracy.

182.    As a direct and proximate result of the conspiracy, Plaintiff was damaged as set forth herein.

44

## DAMAGES

183. As a direct and proximate result of the wrongful conduct of all Defendants as set forth in the foregoing counts, Plaintiff Micah Lloyd Bunce has suffered damages including, without limitation:

(a) Loss of liberty as a result of his unlawful arrest and the pendency of baseless criminal charges;

(b) Loss of any income and employment benefits during approximately four (4) months of administrative leave;

(c) Attorney's fees and costs incurred in defending against the malicious and frivolous perjury prosecution;

(d) Costs of approximately 110 hours of professional training courses — courses Plaintiff should never have been required to take;

(e) Costs of professional counseling sought to address the anxiety, fear, humiliation, and emotional distress caused by Defendants' conduct;

(f) The cost and burden of expungement proceedings required to remove the publicly accessible arrest record from Plaintiff's record including, but not limited to, attorneys' fees;

(g) Severe emotional distress, anxiety, humiliation, fear for his safety and the safety of his family, and ongoing apprehension regarding future retaliation;

(h) Significant damage to Plaintiff's professional reputation in the legal and law enforcement communities of Saline County and the State of Kansas, in which his credibility as a BIDS investigator is essential to his professional function;

(i) The loss of time, attention, and emotional resources that Plaintiff should have been able to devote to supporting his wife, Cheryl Bunce, during her treatment for Merkel cell

carcinoma, a rare and aggressive cancer with which she was simultaneously battling during the pendency of this prosecution;

(j) Such other damages as are established at trial.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff MICAH BUNCE prays for damages against the defendants, both individually and jointly, as follows:

Under Counts 1-6: (a) compensatory damages in excess of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs; (b) punitive damages; and (c) costs, expenses and reasonable attorney's fees pursuant to 42 U.S.C. § 1988.

Under Counts 7-10, Plaintiff claims compensatory damages in excess of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs. Plaintiff further requests any other relief the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff MICAH BUNCE hereby demands a trial by jury. Pursuant to D. Kan. Local R. 40.2, plaintiff will file a Designation of Place of Trial contemporaneous to the filing of his Complaint, designating Wichita, Kansas as the Place of Trial.

Respectfully submitted,

HUTTON & HUTTON

*/s/ Matthew M. Dwyer, #22492*
Matthew M. Dwyer, #22492
Blake A. Shuart, #24463
8100 E. 22nd St. N., Bldg. 1200
Wichita, KS 67226
Phone: (316) 688-1166
Fax: (316) 686-1077
E-Mail:       Matthew.Dwyer@huttonlaw.com
                   Blake.Shuart@huttonlaw.com
*Attorneys for Plaintiff*

46